**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MICHAEL JOHN MOE, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> MORTHERN NEVADA CORRECTIONAL ) <br> CENTER et al., ) <br> ) <br> Defendants. ) | 3:14-cv-00689-RCJ-VPC <br><br> **ORDER** |

This is a prisoner civil rights complaint pursuant to 42 U.S.C. § 1983. The Court now screens the Complaint under 28 U.S.C. § 1915A and dismisses it, without leave to amend.

**I.   FACTS AND PROCEDURAL HISTORY**

Plaintiff has sued multiple defendants for events that took place while he was incarcerated at Northern Nevada Correctional Center ("NNCC"). (See Compl., ECF No. 1-1). Plaintiff names NNCC, Warden I. Baca, Associate Warden Lisa Walsh, Sgt. Eugene Murguia, Sgt. Rocky Baros, Senior Correctional Officer Roberson, Senior Correctional Officer Ralston, Senior Correctional Officer Richard Shepherd, and John Doe as Defendants.

In August 2012, Plaintiff's girlfriend mailed Plaintiff a football schedule from Reno, Nevada. (*Id.* 4). On August 20, 2012, Plaintiff received the entire football schedule except pages 17 through 30. (*Id.*). On August 21, 2012, Plaintiff sent a kite to the mail room supervisor, Roberson, about the missing pages of the football schedule. (*Id.*). On August 23, 2012,

Roberson responded, "Don't waste my time with this nonsense. Contact postmaster for lost items. All mail is issued daily." (*Id.*). After a month and half, Plaintiff still had not received the last pages of the football schedule from his girlfriend or mailings from NBC affiliates even though they both had mailed the football schedule to Plaintiff multiple times. (*Id.* 5).

On October 11, 2012, Plaintiff received an unauthorized mail notification from the mail room which included a letter from October 1, 2012 and the missing pages of the football schedule. (*Id.*). That same day, Plaintiff submitted a response to Roberson, as instructed by the unauthorized mail notification. (*Id.*). In the response, Plaintiff stated that he would "grieve unauthorized mail."(*Id*. 8). Roberson received the response on the morning of October 12, 2012. (*Id.* at 5). Around 10 a.m. that morning, prison officials searched Plaintiff's room and wrote him up for being in possession of a football schedule. (*Id.*). Plaintiff was not present during the search. (*Id.*). Baros reported that he had found betting slips with picks and bet amounts and an unauthorized lamp in Plaintiff's shared room. (*Id.* 5-6).

On October 14, 2012, Plaintiff received a write up for MJ-26, possession of contraband (i.e. the football schedule) and G-3, gambling. (*Id.* 6). On October 15, 2012, Sgt. Murguia called Plaintiff to the disciplinary office at 1:30 p.m. and told Plaintiff that he was giving Plaintiff a courtesy 24-hour notice for Plaintiff's disciplinary hearing. (*Id.*). On October 16, 2012, Sgt. Murguia held Plaintiff's disciplinary hearing at 9:30 a.m. (*Id.*). Sgt. Murguia did not permit Plaintiff to have any witnesses or cross-examination. (*Id.*). Sgt. Murguia only presented the write-up as evidence during the hearing. (*Id.*). Sgt. Murguia did not record the entire hearing. (*Id.*). Sgt. Murguia found Plaintiff guilty and sentenced him to nine months disciplinary segregation, a 15-day consecutive disciplinary segregation sentence, and 90 days of forfeited stat time. (*Id.* 7). Sgt. Murguia also transferred Plaintiff to a Southern Desert Correctional Center, 400 miles away from his girlfriend. (*Id.*).

Count I for First Amendment retaliation alleges that Roberson targeted Plaintiff when Plaintiff responded that he was going to file a grievance with respect to the unauthorized mail. (*Id.* 9). Plaintiff alleges that Defendants chilled his First Amendment rights when they searched his room, wrote him up, put him in the hole, took stat time from him, and transferred him 400 miles away. Count II alleges First, Fifth, Eighth, and Fourteenth Amendment violations. (*Id.* 12). Count III alleges Fifth and Fourteenth Amendment violations. (*Id.* 15). Plaintiff claims he had no betting slips and that the football schedules were not parlay cards. (*Id.*). The Court interprets the allegations in the complaint as claims for First Amendment retaliation and procedural due process.

## II.  LEGAL STANDARDS

District courts must screen cases in which a prisoner seeks redress from a governmental entity or its officers or employees. 28 U.S.C. § 1915A(a). A court must identify any cognizable claims and must dismiss claims that are frivolous, malicious, insufficiently pled, or directed against immune defendants. *See id.* § 1915A(b)(1)–(2). Pleading standards are governed by Rule 12(b)(6). *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012). When a court dismisses a complaint upon screening, the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. *Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995). To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

///

///

///

## III. ANALYSIS

### A. First Amendment Retaliation

Prisoners have a First Amendment right to file prison grievances and pursue civil rights litigation in the courts. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004). "Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because *purely* retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Id.* (emphasis added). To state a viable First Amendment retaliation claim in the prison context, a plaintiff must allege: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567–68.

Plaintiff states no colorable First Amendment retaliation claim, and the allegations he makes in the Complaint show that amendment would be futile. Plaintiff admits he informed Roberson that he had not received a complete football schedule, but only a partial one. He also appears to admit that the item was contraband. Even assuming the search for the football schedule and related items was partly motivated by Plaintiff's threat of filing a grievance, confiscation of the contraband item (the partial football schedule) that Plaintiff had admitted to possessing was not purely retaliatory because it reasonably advanced the legitimate correctional goal of preventing gambling amongst inmates. *See id.* at 567–58; *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994).

///

///

**B.     Procedural Due Process**

"Prisoners may . . . claim the protections of the Due Process Clause [and] may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Still, because prisoners have already been convicted, "the full panoply of rights due a defendant in [criminal] proceedings does not apply. [Rather], there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* (citations omitted). When a prisoner faces disciplinary charges, prison officials must provide the prisoner with: (1) a written statement at least twenty-four hours before the disciplinary hearing that includes the charges, a description of the evidence against the prisoner, and an explanation for the disciplinary action taken; (2) an opportunity to present documentary evidence and call witnesses, unless calling witnesses would interfere with institutional security; and (3) legal assistance where the charges are complex or the inmate is illiterate. *See id.* at 563–70.

However, no *Wolff*-type due process protections apply unless the result of the hearing is a punishment that impairs a constitutionally cognizable liberty interest as defined in *Sandin v. Connor*, 515 U.S. 472 (1995). Under *Sandin*, segregation within prison does not in and of itself constitute a deprivation of a constitutionally cognizable liberty interest. *E.g.*, *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1997); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995). Although *Sandin* concerned administrative segregation, it applies with equal force to disciplinary segregation, because the State's motivation is not relevant to the antecedent inquiry: whether the result of the segregation deprives the prisoner of a constitutionally cognizable liberty interest. If the answer to that antecedent question is "no," then no procedures at all are constitutionally "due," and a due process claim necessarily fails. Just as a prison cannot avoid the strictures of the Due Process Clause simply by labeling segregation as "protective" or "administrative," a

prisoner cannot invoke the Clause simply by characterizing segregation as "disciplinary" or "punitive." No matter how a prisoner's segregation (or other deprivation) is labeled by the prison or characterized by the prisoner, a court must examine the substance of the alleged deprivation and determine whether it constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" before it determines whether Wolff-type procedural protections apply. *Sandin*, 515 U.S. at 484.

Showing that a deprivation is "atypical" with respect to the hardships of ordinary prison life is difficult, because prison conditions are typically harsh. Prisoners are by definition segregated from the public at large, and they are typically segregated even from other prisoners for the vast majority of any given day, except for perhaps one other cell mate. Indeed, the Court of Appeals has noted that "it would be difficult (we do not say impossible) to make disciplinary segregation sufficiently more restrictive than the conditions of the general population . . . to count as an atypical and significant deprivation of liberty[.]" *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (Aldisert, J.) (quoting *Wagner v. Hanks*, 128 F.3d 1173, 1174 (7th Cir. 1997)) (alterations in original). A court in this Circuit looks at three factors under *Sandin*: "(1) whether the conditions of confinement mirrored those conditions imposed upon inmates in analogous discretionary confinement settings, namely administrative segregation and protective custody[;] (2) the duration and intensity of the conditions of confinement; and (3) whether the change in confinement would inevitably affect the duration of [the prisoner's] sentence." *See Chappell v. Mandeville*, 706 F.3d 1052, 1064–65 (9th Cir. 2013) (second alteration in original; internal quotation marks omitted). In other words, if the conditions in segregation are worse than those a prisoner will typically encounter in prison, the Court must still consider whether the conditions are extreme enough in nature and duration or whether they will necessarily affect the length of a prisoner's sentence. Segregation may lead to a cognizable deprivation of liberty, for

example, if the conditions of segregation, although not in themselves harsh enough to implicate a cognizable liberty interest, result in the deprivation of some other interest particular to the aggrieved prisoner. *See Serrano*, 345 F.3d at 1074, 1078–79 (finding that segregation of a partially paralyzed plaintiff for almost three months to an area where he could not use the wheelchair he was permitted in the general population, such that he could not shower and had difficulty using the bathroom and the bed, implicated a cognizable liberty interest).

Plaintiff here alleges only the pure fact of segregation and its duration, not that the conditions of segregation were materially worse than in administrative segregation or protective custody. The Court therefore dismisses the due process claim. In some cases, the Court would give leave to amend to allege facts indicating that the conditions he experienced in disciplinary segregation were atypically harsh with respect to conditions in the general population, administrative segregation, or protective custody. Here, however, amendment is futile, because Plaintiff has alleged that one result of Sgt. Murguia's ruling was the loss of 90 days of good time credits, resulting in a longer prison sentence. Sgt. Murguia's ruling therefore cannot be the basis of a § 1983 action unless and until reversed on appeal or vacated via writ of habeas corpus. *See Edwards v. Balisok*, 520 U.S. 641, 645–48 (1997) (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).

///

///

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Leave to Proceed in Forma Pauperis (ECF No. 1) and the Motion for Appointment of Counsel (ECF No. 1-2) are DENIED as moot.

IT IS FURTHER ORDERED that the Clerk shall DETACH and FILE the Complaint (ECF No. 1-1).

IT IS FURTHER ORDERED that the Complaint is DISMISSED, without leave to amend.

IT IS FURTHER ORDERED that a Certificate of Appealability is DENIED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 20th day of May, 2015.

_____
ROBERT C. JONES
United States District Judge